# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSÉ HERNANDEZ,  Plaintiff, <br><br> v. <br><br> ILLINOIS DEPARTMENT OF CORRECTIONS, et al., <br><br> Defendants. | Case No. 3:17-cv-01335-NJR |

## PLAINTIFF'S RESPONSE TO DEFENDANTS ILLINOIS DEPARTMENT OF CORRECTIONS, ANNE ELIZABETH TREDWAY, LORIE CUNNINGHAM, AND DEE DEE BROOKHART'S MOTION FOR SUMMARY JUDGMENT

In 2012, Plaintiff José Hernandez was involved in a tragic car accident while driving under the influence of alcohol. His girlfriend was killed in the crash, and he was left paralyzed from the chest down. He then served two years in prison at Lawrence Correctional Center ("Lawrence"), where he was confined to the prison infirmary.

As a quadriplegic inmate, Mr. Hernandez was unable to perform the most basic daily tasks and was incapable of even rolling himself over in bed. To avoid pain and pressure ulcers, Mr. Hernandez was completely dependent on the good graces of the infirmary staff to reposition his body throughout the day. When the infirmary staff waited too long to turn and reposition him, Mr. Hernandez would push the call button for assistance. It was common for infirmary staff not to respond to Mr. Hernandez's calls for help. If staff failed to respond, Mr. Hernandez had to lay in pain until a staff member showed up, sometimes hours after he asked for help. Mr. Hernandez repeatedly complained to Defendant Anne Elizabeth Tredway, then an Assistant Warden at Lawrence, but his attempts to use the call button remained futile. On June 6, 2015, after his

1

repeated call button requests went unanswered, Mr. Hernandez tried to turn himself over in bed to alleviate his severe pain. In the process, a bone in his right forearm snapped.

In addition to requiring regular repositioning by infirmary staff, Mr. Hernandez also required a medical alternating air mattress to relieve pain and prevent pressure ulcers. In the spring of 2016, Mr. Hernandez's air mattress began leaking. Because the mattress did not provide necessary support, Mr. Hernandez developed a new pressure ulcer on his left buttock, the pressure ulcer on his right buttock worsened, and he was constantly in pain. Mr. Hernandez told Defendants Dee Dee Brookhart, Lorie Cunningham, Dr. John Coe, and Jon-Michael Allender that his mattress was leaking, but Defendants ignored him. Mr. Hernandez was left to sleep on a partially deflated mattress until he was released from prison.

Mr. Hernandez has presented sufficient evidence for a reasonable jury to find that: (1) the Illinois Department of Corrections ("IDOC") violated the Americans with Disabilities Act and the Rehabilitation Act by failing to provide him with accommodations that would have ensured he had a reasonably safe place to sleep; (2) Defendant Tredway was deliberately indifferent to his serious medical needs by ignoring his complaints that infirmary staff were ignoring the call button; and (3) Defendants Brookhart and Cunningham were deliberately indifferent to his serious medical needs by ignoring his complaints that his mattress was nonfunctional. As such, Defendants IDOC, Tredway, Brookhart, and Cunningham's motion for summary judgment should be denied.

## PROCEDURAL BACKGROUND

Mr. Hernandez filed his Amended Complaint on April 25, 2018. ECF 49. He brought claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against IDOC; claims under 42 U.S.C. § 1983 against then-Assistant Warden Tredway and Dr. John Coe for showing deliberate indifference to his serious medical needs in violation of the Eighth

Amendment; and a claim under 42 U.S.C. § 1983 against Wexford Health Sources, Inc. ("Wexford") (a corporate medical provider serving prisons) for maintaining an unconstitutional policy or custom in violation of the Eighth Amendment. Mr. Hernandez filed a second Complaint on July 25, 2018. Case No. 3:18-cv-01442, ECF 1. The July 25th Complaint included ADA and Rehabilitation Act claims against IDOC and Eighth Amendment claims against Coe, Health Care Unit Administrator ("HCUA") Lorie Cunningham, Nurse Jon-Michael Allender, and then-Assistant Warden Dee Dee Brookhart. Case No. 3:18-cv-01442, ECF 1. These two cases were consolidated. ECF 68.

Defendants IDOC, Tredway, Brookhart, and Cunningham have moved for summary judgment. ECF 153.

**FACTS**

When Mr. Hernandez arrived at Lawrence Correctional Center on July 2, 2014, he was a partial quadriplegic. ECF 148-1; ECF 148-2 at 107:24–108:2. Mr. Hernandez is paralyzed from the chest down. *Id*. at 108:6–10. He has limited mobility in his arms but is unable to grasp with his hands. *Id.* at 108:1–2. Upon arriving at Lawrence, he was admitted to the infirmary and stayed there for the entirety of his sentence. ECF 148-3 at 90:11–16.

Mr. Hernandez lived in infirmary wards A and B, which is where the "sick[est] of the sick" patients live, who need "24/7 nursing care" and "have serious medical needs." Ex. A (Dep. Tr. of J. Hernandez, June 28, 2019) at 143:13–16; Ex. B (Dep. Tr. of L. Cunningham In Her Personal Capacity & as IDOC's Fed. R. Civ. P. 30(b)(6) Rep., Feb. 4, 2020) at 136:17–23. As a quadriplegic patient, Mr. Hernandez needed extensive assistance with activities of daily living such as turning over in bed, eating, bathing, and going to the bathroom. Ex. C (Report of Dr. Rachna Soriano, D.O., Mar. 17, 2020) at 3; ECF 148-4 at 44:20–23. Defendant Dr. John Coe, the

3

medical director at Lawrence and a Wexford employee, ordered that Mr. Hernandez be turned and repositioned upon request and that he use a medical alternating air mattress to avoid pressure ulcers. Ex. D (Dep. Tr. of J. Coe, Dec. 16, 2019) at 134:4–10; Ex. E (Bates HERNANDEZ-LLC (MR) 00465); Ex. A (Dep. Tr. Hernandez) at 124:20–25.

Pressure ulcers form when bony protuberances, like the pelvis, put unrelieved pressure on soft tissue, which ultimately leads to skin breakdown. Ex. C at 4. Mr. Hernandez, who cannot turn or reposition himself in bed to relieve pressure on certain parts of his body, relies on infirmary staff to help him shift positions and avoid pressure sores. *Id.*; ECF 148-3 at 90:17–20, 91:23–92:5. Quadriplegic patients are supposed to be turned approximately every two hours. Ex. C at 4. A medical alternating air mattress, in conjunction with turning and repositioning, also helps prevent pressure ulcers from developing or getting worse. *Id.* at 5. An alternating air mattress consists of a series of tubes, with half the tubes periodically inflating and deflating to shift the weight of the patient. *Id.*

IDOC employees did not provide bedside medical care, but they were responsible for ensuring patients' medical needs were being met. IDOC employees, including then-Assistant Warden Anne Tredway, then-Assistant Warden Dee Dee Brookhart, and HCUA Lorie Cunningham were required to conduct rounds in the infirmary, listen to patients' complaints, investigate those complaints, and ensure that Wexford and its staff were addressing patients' medical needs. *See* Ex. F (Dep. Tr. of A. E. Tredway, Feb. 18, 2020) at 20:23–21:1 (stating that "ensur[ing] . . . that the nurses were doing their jobs" was one of her responsibilities as assistant warden); *id.* at 25:21–26:6 (agreeing that, as the assistant warden, it was her job to "ensure that nursing staff in the Infirmary complied with IDOC policy"); *id.* at 65:2–6 (agreeing that she worked with other IDOC and Wexford employees to "make sure that the healthcare needs of the

4

offenders at Lawrence Correctional Facility were being met"); Ex. G (Dep. Tr. of D. Brookhart, Feb. 18, 2020) at 56:14–25, 58:5–7, 58:17–25 (stating that the assistant warden and health care unit administrator were responsible for investigating and addressing infirmary patients' complaints); Ex. B (Dep. Tr. Cunningham & IDOC) at 173:2–7 (agreeing that, as the health care unit administrator, she was responsible for ensuring that IDOC's health care directives were "complied with"). Assistant wardens also were responsible for ensuring that Wexford was fulfilling its obligations to provide healthcare services under its contract with IDOC. This includes "[e]nsuring that there's proper staffing" and "that the services that the contractor is to provide . . . are, in fact, being provided." Ex. G (Dep. Tr. Brookhart) at 19:12–21; *see also id.* at 26:8–19, 27:10–15.

In order to alert medical staff that they were in pain, needed to be turned, or were otherwise experiencing medical distress, infirmary patients were supposed to have access to a call button. According to both Wexford and IDOC policies, staff is always supposed to respond to a call button alert. Ex. B (Dep. Tr. Cunningham & IDOC) at 146:1–9 ("Q: Is it ever permissible to ignore a call button request? A: Never. Q: Is it IDOC's policy that call button requests are to be responded to immediately? A: Yes."); Ex. H (Dep. Tr. of R. Matticks as Wexford's Fed. R. Civ. P. 30(b)(6) Rep., Feb. 27, 2020) at 29:1–5 ("Q: Does Wexford require that its employees in Illinois facilities respond to a call button system in those facilities that have a call button? A: Yes.").

   1. *Defendant Tredway knew that infirmary staff was turning off or ignoring the call button when patients like Mr. Hernandez pushed the button.*

Despite the importance of the call-button system to infirmary patients at Lawrence, including Mr. Hernandez, patients did not have consistent access to the call button and often could not obtain medical help because infirmary staff was turning off or ignoring the button. ECF 148-4 at 47:8–20, 48:5–9, 49:18–20; ECF 148-6 at ¶¶ 9–11. On numerous occasions Mr. Hernandez

5

complained directly to Defendant Tredway about staff ignoring the call button while she did rounds through the infirmary as part of her duties as Assistant Warden of Programs. Ex. A (Dep. Tr. Hernandez) at 150:18–152:2; ECF 148-6 at ¶ 16; ECF 148-5 (P0000018, Grievance, June 18, 2015).

Mr. Hernandez was not the only inmate to complain to Defendant Tredway about the issue. Defendant Tredway admitted that she heard similar complaints from inmates in 2014 and the first half of 2015. Ex. I (Bates 001210–211) (reporting that patients told her about "a certain night nurse on midnights failing to reposition them to avoid skin breakdown, and responding to [call button] light promptly"); Ex. F (Dep. Tr. Tredway) at 55:20–56:5 (agreeing that she heard complaints "that Infirmary staff were ignoring the call button"). Indeed, it appears to be common knowledge among IDOC management that infirmary staff were ignoring the call button system. Defendant Brookhart admitted that she, too, heard complaints about the call-button system when she served as Assistant Warden of Programs in 2016, including that the system "was not working appropriately consistently," Ex. G (Dep. Tr. Brookhart) at 68:19–20, that the system "was not reliable," *id.* at 67:24–68:12, and that sometimes the system would "sound, but not light, or light and not sound" *id.*

  2. *Defendant Tredway ignored the complaints of Mr. Hernandez and other inmates about the call-button system.*

Despite hearing a number of complaints from Mr. Hernandez and other patients, Defendant Tredway did nothing. Patients continued to try to get help using the call button to no avail. ECF 148-6 at ¶ 17; Ex. A (Dep. Tr. Hernandez) at 153:2–21. Mr. Hernandez was not being turned regularly by infirmary staff and would lie in pain for hours without any way to tell staff that he needed to be repositioned. Ex. C at 1, 4, 7; ECF 148-5; Ex. J (Bates P0000014–015, Grievance, June 25, 2015); Ex. K (Bates P0000012–013, Grievance, July 21, 2015); Ex. L (Bates P0000010–

6

011, Grievance, July 30, 2015); Ex. A (Dep. Tr. Hernandez) at 122:12–17, 124:20–125:3; *see, e.g.*, Ex. M (Bates HERNANDEZ-LCC (MR) 00877, 01049, 01074, 00453, 00029) (showing that Mr. Hernandez went long stretches of time without being turned and repositioned, including 14.5 hours on November 20, 2014; 9.5 hours on May 21, 2015; 11 hours between June 15 and 16, 2015; 9 hours on June 12, 2016; and 10 hours on July 16, 2016).

> 3. *As a direct result of Defendant Tredway's failure to address Mr. Hernandez's complaints about the call-button system, Mr. Hernandez broke his arm trying to reposition himself in bed.*

On the night of June 6, 2015, Mr. Hernandez was experiencing severe pain and needed to be turned and repositioned by infirmary staff. ECF 148-4 at 48:13–49:5; ECF 148-5. Mr. Hernandez, unable to do so himself, asked another patient to press the call button to alert staff that he needed medical attention. ECF 148-4 at 48:22–49:1; ECF 148-5; ECF 148-6. They tried pushing the call button and shouting, but no one responded. ECF 148-4 at 49:7–14; ECF 148-5. Because he was experiencing severe pain, Mr. Hernandez attempted to turn himself over by wedging his arm in the bedframe, fracturing his left forearm in the process. *Id.*

> 4. *Defendants Brookhart and Cunningham ignored Mr. Hernandez's complaints that his alternating air mattress was not working, leading to severe pain and open wounds.*

Mr. Hernandez received a medical alternating air mattress shortly after his arrival at Lawrence and continued to require one throughout his time in the infirmary. Ex. E; Ex. C at 5. In the spring of 2016, Mr. Hernandez's mattress stopped working. Ex. N (P0000008, Grievance, June 27, 2016); Ex. O (Dep. Tr. of J. Hernandez, June 27, 2019) at 26:24–27:1; Ex. P (Bates HERNANDEZ-LCC (MR) 00447, 00449, 00005, 00015). It would not inflate enough to support Mr. Hernandez's body, causing his buttocks to sink into his bed and press against the hard surface underneath. Ex. N. Lying on this hard surface caused him excruciating pain, made worse by the fact that Mr. Hernandez was not being turned and repositioned regularly. *Id.*; Ex. C at 6–7. Because

7

of the constant pressure on his buttocks, the open pressure ulcer on his right buttock became larger and a new wound broke out on his left buttock. Ex. N; Ex. O (Dep. Tr. Hernandez) at 19:2–16 (stating that the pressure ulcer on his left buttock "broke out due to the mattress . . . not functioning); Ex. C at 6–7; Ex. P; Ex. Q (Bates HERNANDEZ-LCC (MR) 000024, 00033, 000037, 00039–00040).

Mr. Hernandez complained directly to Defendants Brookhart and Cunningham about his need for a new air mattress during in-person conversations. Ex. N; Ex. A (Dep. Tr. Hernandez) at 169:11–13, 178:22–179:2. He also complained to Dr. Coe, who informed Mr. Hernandez that he would not order a new mattress so close to Mr. Hernandez's release date. Ex. N; Ex. O (Dep. Tr. Hernandez) at 31:1–3.

By mid-June, Mr. Hernandez still had not received a functional air mattress. At that point, Jon-Michael Allender, Wexford's Director of Nursing, directed a porter (an inmate who works in the infirmary) to switch the broken air mattress for an old mattress kept in storage. Ex. N; Ex. O (Dep. Tr. Hernandez) at 18:16–24. This secondhand mattress was no better and also leaked, giving Mr. Hernandez no relief. Ex. N. Mr. Hernandez's pressure ulcers continued to worsen, and he continued to experience pain. By the time Mr. Hernandez filed a grievance on June 27, 2016, he had been complaining about his mattress for "months." *Id.*

Mr. Hernandez did not receive a functional mattress before he was released on July 25, 2016. Ex. O (Dep. Tr. Hernandez) at 31:1–3; ECF 148-4 at 68:10–11. Mr. Hernandez left Lawrence with open wounds on his left and right buttocks. Ex. R (Decl. of J. Hernandez); Ex. S

(Decl. of D. Hernandez); Ex. T (Decl. of C. Vierra); Ex. P; Ex. Q; Ex. U (Bates HERNANDEZ-LCC (MR) 00038).[1]

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "draw[] all reasonable inferences in [the non-moving party's] favor." *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015). "A fact is material if it is outcome determinative under applicable law." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). "A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

**ARGUMENT**

I. **Mr. Hernandez Has Raised Triable Issues of Material Facts Upon Which a Reasonable Jury Could Find That IDOC Violated the Americans with Disabilities Act and Rehabilitation Act.**

The Americans with Disabilities Act states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act's mandate is nearly identical. *See* 29 U.S.C. § 794, *et. seq*.[2] If a public entity fails to reasonably accommodate an incarcerated person's

---

[1] Signed declarations from Mr. Hernandez, Ex. R, and Dora Hernandez, Ex. S, have been delayed in the mail. Unsigned copies have been attached as exhibits to this brief. Signed copies will be filed with the Court promptly upon receipt.

[2] Mr. Hernandez also has brought claims against IDOC under the Rehabilitation Act, which are based on the same allegations as his ADA claims. The Rehabilitation Act is nearly identical to the ADA with the exception that the Rehabilitation Act requires that the public entity receive federal funds. *Juech v. Children's Hosp. and Health Sys., Inc.*, 353 F. Supp. 3d 772, 778 (E.D. Wis. 2018). "The relevant provisions and implementing regulations of the Rehabilitation Act and the ADA are 'materially identical.'" *A.H. v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018). "[P]recedent under one statute generally applies to the other." *Wells v. Bureau County*, 723 F. Supp. 2d 1061, 1086 n.4 (C.D. Ill. 2010). Because IDOC already has admitted to receiving federal funds, Doc. 53, IDOC Defs.' Answer to Amended Compl., ¶ 41–42, the facts to be proven under each statute are, in this case, identical. For

disability, that "refusing to make reasonable accommodations is tantamount to denying access." *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012). It is undisputed that Mr. Hernandez, who is paralyzed from the chest down, is a "qualified individual with a disability" and that IDOC is a "public entity." 42 U.S.C. §§ 12102, 12131; ECF 53, IDOC Defs.' Answer to Am. Compl., ¶¶ 32–33, 41–43.

Prisons are required to provide disabled inmates with access to a reasonably safe place to sleep, which constitutes a "service[], program[], or activity" under the ADA. Defendants neglect to inform this Court that the U.S. Supreme Court has held that the "deliberate refusal. . . to accommodate [an incarcerated person's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constitutes 'exclusion from participation in or denial of the benefits of the prison's services, programs, or activities." *United States v. Georgia*, 546 U.S. 151, 157 (2006). As was true in 2017 when IDOC attempted to rely on *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996), to argue that "sleeping is not an activity or program" under the ADA, "IDOC's position is not consistent with the U.S. Supreme Court's holding in *United States v. Georgia*." *Rosario v. Wexford Health Care*, No. 15-CV-1008-MJR, 2015 WL 5935244, *3 (S.D. Ill. Oct. 13, 2015). Prisons are required to provide incarcerated persons with sleeping accommodations "that will accommodate [their] disability-related needs." *Rosario,* 2015 WL 5935244 at *3; *see also Simmons v. Ill. Dep't of Corr.*, No. 14-cv-479-JPG, 2014 WL 2159000, *4 (S.D. Ill. May 23, 2014) (holding that "the basic need for an adequately accessible bed may also be viewed" as a service or program under the ADA); *Legore v. Allsup*, No. 16-CV-01137-MJR, 2017 WL 131578, *1 (S.D. Ill. Jan. 13, 2017) (same).

---

efficiency's sake, this brief will collectively refer to the Americans with Disabilities Act and the Rehabilitation Act as the "ADA."

10

IDOC cannot abdicate its responsibilities under the ADA by laying blame on Wexford and its employees. IDOC has an obligation under the ADA to ensure that disabled inmates are provided with accommodations and that those accommodations continue. Ex. B (Dep. Tr. Cunningham & IDOC) at 237:18–238:3. Defendants clearly have stated that it is their responsibility to listen to infirmary patients and ensure that their needs are being met. Ex. G (Dep. Tr. Brookhart) at 26:17–19, 56:14–25, 58:5–7, 58:17–25; Ex. F (Dep. Tr. Tredway) at 20:23–21:1, 50:3–13, 65:2–6; Ex. B (Dep. Tr. Cunningham & IDOC) at 75:9–18, 173:2–7. Their jobs involve ensuring that Wexford is providing infirmary patients with appropriate medical care; Wexford does not have free rein over the infirmary. Defendants were capable of ensuring that staff responded to call button requests and that infirmary patients received air mattresses. In fact, in her role as Health Care Unit Administrator for IDOC, Defendant Cunningham communicated with Wexford employees to ensure that a medical alternating air mattress was ordered for a patient. Ex. V (Bates 003738–40). Whether she did the same for Mr. Hernandez is disputed.

It is clearly disputed that "Plaintiff has continuously been provided with appropriate accommodations." ECF 153 at 19. Because of his quadriplegia, Mr. Hernandez required access to a call button to get the attention of medical staff and an alternating air mattress. *See* Ex. D (Dep. Tr. Coe) at 134:4–10; Ex. E; Ex. A (Dep. Tr. Hernandez) at 124:20–25. Without these accommodations, Mr. Hernandez lacked a safe place to sleep that put him at risk of (and resulted in) pain and injury. *See, supra*, 7–8. Despite complaints to Defendants, who were responsible for investigating and addressing complaints, they did nothing. Mr. Hernandez never received the accommodations to which he was entitled. Ex. O (Dep. Tr. Hernandez) at 31:1–3; ECF 148-4 at 68:10–11).

## II. Mr. Hernandez Has Presented Evidence Upon Which a Reasonable Jury Could Find that Defendants Tredway, Brookhart, and Cunningham Were Deliberately Indifferent to His Serious Medical Needs.

"[T]he Eighth Amendment safeguards [a] prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (quotation marks omitted). In order to demonstrate an Eighth Amendment violation, a plaintiff must prove "that prison staff [were] deliberately indifferent to an objectively serious medical condition." *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016). "Where . . . an inmate sues prison employees who are not part of the medical staff, deliberate indifference can be shown with evidence that those employees ignored or interfered with a course of treatment prescribed by a physician," *id.*, or ignored an obvious medical need. *Mathison v. Moats*, 812 F.3d 594, 598 (7th Cir. 2016). Prison staff "are not excused from ensuring adequate treatment for inmates with chronic or degenerative conditions simply because any resulting harms . . . have not yet reached the point of causing acute or life-threatening injuries." *McDonald*, 821 F.3d at 889.

"An objectively serious medical condition" is a condition that either "a physician has diagnosed as needing treatment or that is so obviously serious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quotation marks omitted). It is undisputable that Mr. Hernandez suffered from "an objectively serious medical condition." Mr. Hernandez is paralyzed from the chest down and requires constant medical care to engage in activities of daily living. Ex. B (Dep. Tr. Cunningham & IDOC) at 136:17–23; Ex. A (Dep. Tr. Hernandez) at 143:16. He needs to be turned and repositioned and to lay on an alternating air mattress in order to avoid extreme pain and open wounds.

> a. *The Fact That Defendants Are Not Medical Professionals Has No Bearing on Mr. Hernandez's Deliberate Indifference Claims.*

Defendants claim that they cannot have been deliberately indifferent to Mr. Hernandez's serious medical needs because they were not medical providers, but this argument has no basis in law. Defendants have been unable to cite any cases in support of this proposition because it is well-established that an IDOC employee can be held liable for deliberate indifference to an inmate's serious medical needs even though she is not a medical professional. *McDonald*, 821 F.3d at 888; s*ee also Diggs v. Ghosh*, 850 F. 3d 905, 911 (7th Cir. 2017); *Mathison*, 812 F.3d at 598 (reversing grant of summary judgment in favor of a prison lieutenant who failed to summon medical assistance after she spoke to an inmate who said he was experiencing heart attack symptoms). In *Diggs v. Ghosh*, a case that the Defendants also cite, ECF 153 at 15, the Seventh Circuit reversed the District Court's grant of summary judgment to a prison warden, because there was "sufficient" evidence "to show that [the warden] had knowledge" of the inmate's serious medical need and "took no action in response to [the inmate's] repeated complaints." 850 F.3d at 911.

> b. *There Is No Legal Basis for Concluding That Defendants Were Simply Deferring to the Doctor's Medical Judgment, as Defendants Knew That Mr. Hernandez's Serious Medical Need Was Not Being Addressed in Contravention with Medical Orders.*

The evidence in this case strongly suggests that Defendants knew that Mr. Hernandez was not receiving care in accordance with medical orders. *Giles v. Godinez*, 914 F.3d 1040 (7th Cir. 2019), cited by Defendants for the proposition that "non-medical officials may reasonably defer to the judgment of medical professionals," ECF 153 at 16, is inapposite. Defendants were not deferring to the judgment of medical professionals—in fact, they were doing the opposite. Both IDOC and Wexford have policies requiring staff to respond to call-button requests, of which Defendant Tredway was well aware. Ex. B (Dep. Tr. Cunningham & IDOC) at 146:1–9; Ex. H (Dep. Tr. Wexford) at 29:1–5; Ex. F (Dep. Tr. Tredway) at 25:21–26:6 (stating that it was her job

to ensure that infirmary staff complied with IDOC policy). Defendant Coe had ordered that Mr. Hernandez be turned and that he receive a medical alternating air mattress. Ex. D (Dep. Tr. Coe) at 134:4–10; Ex. E. Defendants Brookhart and Cunningham knew that he should have had a working alternating air mattress. Ex. B (Dep. Tr. Cunningham & IDOC) at 158:12–13; Ex. N; Ex. A (Dep. Tr. Hernandez) at 169:11–13, 178:22–179:2. Mr. Hernandez did not "disagree[] with the medical professionals' treatment plan for him." ECF 153 at 17. He complained to Defendants that his treatment plan was not being carried out.

> c. *Mr. Hernandez Has Provided Sufficient Evidence That Defendants Are Responsible for Deprivations of Mr. Hernandez's Constitutional Rights Because They Failed to Carry Out Their Responsibility to Resolve Infirmary Patient Complaints and Ensure That Medical Needs Were Addressed.*

Mr. Hernandez is suing Defendants because they failed in their obligation to address infirmary patients' complaints about not receiving necessary medical care and ignored his serious medical needs. This has nothing to do with whether Defendants are supervisors. ECF 153 at 13. It is undisputed that Defendants Tredway, Brookhart, and Cunningham regularly conducted rounds in the infirmary to hear patients' complaints. Ex. F (Dep. Tr. Tredway) at 43:17–24, 45:20–46:14; Ex. G (Dep. Tr. Brookhart) at 54:4–56:25; Ex. B (Dep. Tr. Cunningham & IDOC) at 75:9–18. It is undisputed that Defendants had an obligation to investigate and address concerns brought up in patient complaints. Defendants themselves have made clear that it was their responsibility to ensure that infirmary staff complied with IDOC policy and were providing the services they were obligated to perform. Ex. F (Dep. Tr. Tredway) at 20:23–21:1, 25:21– 26:6, 50:3–13, 65:2–6; Ex. I; Ex. G (Dep. Tr. Brookhart) at 19:12–21, 26:17–19, 56:14–25, 58:17–25; Ex. B (Dep. Tr. Cunningham & IDOC) at 146:1–9, 173:2–7.

Whether "Defendants ensured Plaintiff was provided with medical treatment and with the accommodations recommended by his medical doctors," ECF 153 at 16, is the central dispute in

this case and should be heard by a jury. As Defendants note, *id.*, the Seventh Circuit has held that a warden may "not ignore [an inmate] or his mistreatment." *Diggs*, 850 F.3d at 911. Mr. Hernandez has presented evidence that indicates that Defendants *did ignore* Mr. Hernandez's serious medical needs in contravention with a physician's orders. There is evidence that Mr. Hernandez complained directly to Defendants in-person and the problems continued. Ex. F (Dep. Tr. Tredway) at 69:5–73:21; ECF 148-4 at 44:14–16; Ex. A (Dep. Tr. Hernandez) at 150:18–152:2, 153:2–21; ECF 148-6 at ¶ 16; ECF 148-5; Ex. N. A reasonable jury could infer that after Mr. Hernandez complained to Defendants, who had the power to ensure that his medical needs were addressed, he continued to be denied care *because* Defendants did nothing. ECF 148-5; Ex. A (Dep. Tr. Hernandez) at 150:18–152:2, 153:2–4, 153:15–21; ECF 148-6 at ¶¶ 16–17.

While there is ample evidence of Mr. Hernandez's complaints, there is *no* evidence that any of the Defendants ever attempted to address Mr. Hernandez's complaints. Defendants' assertions about what they "would have" done in response to inmate complaints *are not facts*. ECF 153 at 7, 9, 11. Defendant Tredway has pointed to no *facts* that conclusively support her assertion that she discussed Mr. Hernandez's complaints about nursing staff's failure to answer the call button "with the DON to ensure nurses were responding appropriately." ECF 153 at 14. Tredway refers to her affidavit submitted in this case, ECF 153 at 14, ECF 148-3, but her affidavit does not state that she discussed Mr. Hernandez's complaints with the Director of Nursing or that she "ensure[d that] nurses were responding appropriately." ECF 153 at 14, ECF 148-3. Instead, she can only claim that she "*would have* talked to the HCUA and the DON to address the issue." ECF 153 at 2 (emphasis added). What Tredway claims she would have done in response to Mr. Hernandez's complaints is not a fact and does not shed any light what she actually did or did not do in response to Mr. Hernandez's complaints in 2015. At her deposition, Tredway testified that

she *barely remembers* Mr. Hernandez's complaints. Ex. F (Dep. Tr. Tredway) at 69:5–73:21. Self-serving claims about what she 'would have' done is not reliable evidence—much less incontrovertible proof—of what actually happened in 2015 and 2016.

Likewise, what Defendants Cunningham and Brookhart say they "would have" done, ECF 153 at 14, does not constitute a fact, nonetheless an undisputed one. There is no actual evidence that Cunningham and Brookhart did anything to address Mr. Hernandez's complaint. A reasonable jury could consider evidence that Mr. Hernandez complained to Cunningham and Brookhart that his mattress was nonfunctional and that he never received a working mattress in the spring of 2016, and conclude that Cunningham and Brookhart failed to do anything to address his medical need. Ex. N; Ex. O (Dep. Tr. Hernandez) at 31:1–3; Ex. A (Dep. Tr. Hernandez) at 169:11–13, 178:22–179:2.

Defendants misstate Mr. Hernandez's testimony with regard to whether "he talked with Defendants Brookhart or Cunningham before or after he received a new mattress." ECF 153 at 17. Mr. Hernandez did receive air mattresses in 2014 and 2015, *but the provision of those mattresses is not at issue in this case.* Mr. Hernandez's claims are about his non-functional mattress *that was never replaced* in 2016. Case No. 3:18-cv-01442, ECF 1.

### III. Defendants Have Not Demonstrated That They Are Entitled to Qualified Immunity as a Matter of Law.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zaya*, 836 F.3d at 807. Defendants are not entitled to qualified immunity at the summary judgment stage because the availability of this defense hinges on fact-finding that will be conducted at trial. *Id.* As discussed throughout this brief,

there is a dispute as to whether Defendants were deliberately indifferent to Mr. Hernandez's serious medical needs.

Defendants should know that they can be held liable for ignoring an inmate's complaints that he is not receiving medical treatment. It is well established that prison employees can be held liable for Eighth Amendment deliberate indifferent claims if they ignored the fact that an inmate was not receiving care ordered by a physician or otherwise ignored an obvious medical need. *McDonald*, 821 F.3d at 888; *Mathison*, 812 F.3d at 598. Ample available case law should have put Defendants on notice that they could be liable for ignoring an inmate's serious medical need. *See, supra,* 13. The fact that Defendants are not medical professionals is irrelevant. Mr. Hernandez complained to Defendants that he was not receiving care that his physician ordered that he receive; Defendants were acting *contrary* to medical orders, not deferring to medical providers' judgment. *See, supra,* 13–14. It is undisputed that Defendants had an obligation to address inmates' complaints regarding their medical care. *See, supra,* 14–15. Defendants are not immune from suit as a matter of law.

## CONCLUSION

For the foregoing reasons, Mr. Hernandez respectfully requests the entry of an order denying Defendants' motion for summary judgment.

DATED: January 25, 2021

By: *Scott C. Solberg*

Scott C. Solberg
Sarah H. Catalano
Emily E. Sullivan (*pro hac vice*)
EIMER STAHL LLP
224 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Tel. 312-660-7600
Fax: 312-692-1718
ssolberg@eimerstahl.com

scatalano@eimerstahl.com
esullivan@eimerstahl.com

*Attorneys for Plaintiff José Hernandez*

# CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of January 2021, I filed the foregoing document with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Respectfully,

/s/     *Scott C. Solberg*