## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSÉ HERNANDEZ,

        Plaintiff,

v.

ILLINOIS DEPARTMENT OF
CORRECTIONS, WEXFORD HEALTH
SOURCES, INC., JOHN COE,
ANNE ELIZABETH TREDWAY,
LORIE CUNNINGHAM,
DEE BROOKHART, and
JON-MICHAEL ALLENDER,

        Defendants.

Case No. 3:17-CV-1335-NJR

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on the motion for partial summary judgment filed by Plaintiff José Hernandez (Doc. 148), the motion for summary judgment filed by Defendants Illinois Department of Corrections (IDOC), Dee Brookhart, Lorie Cunningham, Anne Elizabeth Tredway ("IDOC Defendants") (Doc. 152), and the motion for summary judgment filed by Defendants Wexford Health Sources, Inc., John Coe, M.D., and Jon-Michael Allender[1] ("Wexford Defendants") (Doc. 158). For the reasons set forth below, the IDOC Defendants are granted judgment as a matter of law. The motion filed by Hernandez is denied, and the motion filed by the Wexford Defendants is granted in part and denied in part.

---

[1] The Clerk of Court is **DIRECTED** to correct Defendant's name on the docket to Jon-Michael Allender.

FACTS

The following facts are not genuinely disputed for purposes of summary judgment. Plaintiff José Hernandez is a former inmate of the IDOC who was housed at Lawrence Correctional Center from July 7, 2014, through July 25, 2016. (Doc. 153-1 at pp. 4, 22). Hernandez is a partial quadriplegic; he is paralyzed from the chest down and cannot grasp with his fingers, though he has limited mobility in his arms. (Doc. 148-2 at pp. 11-12; Doc. 167-3).

Although Hernandez is paralyzed, he can experience pain and discomfort throughout his body. (Doc. 167-3). For example, quadriplegic patients can develop painful pressure ulcers if not repositioned approximately every two hours. (*Id.*). Pressure ulcers form when bones, like the pelvis, put unrelieved pressure on soft tissue. (*Id.*). The pressure in these areas prevents blood from circulating properly, resulting in skin breakdown. (*Id.*). Once a pressure wound develops, and even if that pressure wound heals, there is an extremely high risk the wound will redevelop in the future. (Doc. 158-6 at p. 10). A medical alternating air mattress, in conjunction with turning and repositioning, can help prevent pressure ulcers from developing or worsening. (Doc. 167-3). An alternating air mattress consists of a series of tubes that periodically inflate and deflate to shift the weight of the patient. (*Id.*).

In 2013, prior to entering Lawrence, Hernandez had pressure ulcers on both his left and right buttocks. (Doc. 158-2). Upon Hernandez's arrival at Lawrence in July 2014, the ulcer on his left buttock had healed, while the ulcer on the right buttock was nearly closed but was "complicated by a draining fistula." (Doc. 158-8 at p. 2). Hernandez was

admitted to the infirmary, and Dr. John Coe, the former medical director at Lawrence and an employee of Wexford Health Sources, Inc., ordered Hernandez an alternating air mattress in order to avoid further pressure ulcers. (*Id.* at p. 3; Doc. 168-15 at p. 16). Wexford provides medical services to inmates in the Illinois Department of Corrections. (Doc. 1 at ¶ 9).

Dr. Coe testified that Hernandez required "total care," meaning he used a catheter, could not control his bowel movements, had a special diet and toothbrush, and could not adequately turn himself over in bed. (Doc. 148-3 at pp. 36-37). Because Hernandez was unable to lift the weight of his body using his arms, Dr. Coe also ordered that Hernandez be repositioned every two hours and upon request until the mattress was available. (Doc. 158-8 at p. 1; Doc. 148-3 at pp. 35-36; Doc. 167-4). Hernandez stayed in the infirmary for the entirety of his sentence. (Doc. 148-3 at p. 35).

On August 18, 2014, Hernandez complained to Dr. Coe that the night crew would not turn him over upon request. (Doc. 168-26 at p. 3). Dr. Coe asked the night staff to "please reposition him as he requests if he is not too demanding." (*Id.*). In September 2014, Hernandez was diagnosed with sepsis and a PICC line was inserted for long-term antibiotic therapy. (Doc. 158-8 at p. 17). On October 19, 2014, a nurse noted a small red area approximately half of a centimeter on the crease of the left buttock. (*Id.* at p. 22). In January 2015, Hernandez developed a wound on his right hip. (*Id.* at p. 24). Later that month, a nurse noted that Hernandez's left buttock appeared to be red and raw, and Dr. Coe diagnosed Hernandez with an abscess and stage 1 decubitus ulcer on his right buttock. (*Id.* at pp. 25-26). Dr. Coe ordered a culture of the wound, which came back

positive for MRSA. (*Id.* at pp. 27-28). Dr. Coe prescribed Bactrim. (*Id.*).

Dr. Coe continued to examine Hernandez's wounds over the following months. In February, the wound on Hernandez's right buttock was four centimeters deep with drainage. (*Id.* at p. 29). In March, Dr. Coe noted there was hardly any drainage from the wound, and in April he found that the ulcer was almost closed. (*Id.* at pp. 32-33). But by May 2015, the wound had tunneled about one inch into his right buttock and was again infected with MRSA. (*Id.* at pp. 35-36). A nurse later noted a nickel size area on Hernandez's upper left buttock that was pink and white in color; however, Hernandez did not complain of any pain at that time. (Doc. 158-8 at p. 48).

On the night of June 6, 2015, Hernandez was experiencing severe pain and needed to be turned and repositioned by one of the Wexford staff members. (Doc. 148-4 at pp. 17-18). The infirmary had a call button system that could be used to alert staff when an offender needed assistance. (Doc. 167-2 at p. 143). Each cell in the infirmary had several call buttons in it. (*Id.*). Pressing the button would create a sound and a flashing light at the nurses' station. (*Id.* at p. 144). A correctional officer would then unlock the door for the nurse to enter the ward. (Doc. 167-7 at p. 72). Hernandez could not press the call button himself, so he asked another inmate to press the call button to alert staff that he needed medical attention. (*Id.*). No one responded. (*Id.* at p. 18). Because he was in severe pain, Hernandez attempted to turn himself over by wedging his arm in the bedframe, fracturing his left forearm in the process. (*Id.*; Doc. 148-5).

Dr. Coe examined Hernandez's arm on June 8, 2015, and ordered an x-ray. (Doc. 148-7). The x-ray, performed on June 10, 2015, confirmed Hernandez's ulna, one of

the bones of the forearm, was fractured. (Doc. 148-8). Dr. Coe decided to splint Hernandez's arm for six weeks and send him for another x-ray in three weeks. (Doc. 148-3 at p. 41). He also prescribed Tylenol and Neurontin. (Doc. 158-8 at p. 42). Dr. Coe testified that the decision was made not to send Hernandez to an orthopedic specialist because "the fracture was not particularly displaced," and only one bone in his forearm was fractured. (Doc. 148-3 at pp. 41-42). Minimally displaced ulnar fractures commonly heal without surgical intervention. (Doc. 158-5 at p. 9).

Hernandez received the second x-ray on July 6, 2015. (Doc. 148-10). Although the fracture was "healing," the bone was still broken. (*Id.*; Doc. 148-3 at p. 48). On July 16, 2015, Dr. Coe discontinued the splint for Hernandez's arm, as it was causing an ulcer on his wrist. (Doc. 148-3 at p. 51). Dr. Coe did not request an additional x-ray or send Hernandez to a specialist. (*Id.*).

At a follow-up visit in early August 2015, Dr. Coe physically manipulated Hernandez's arm and determined the bone was solid and had obvious callus, meaning it was bigger than it originally would have been and it was bridging the other bone. (*Id.* at pp. 59-60, 62). The bone also did not "want to move." (*Id.* at p. 62). Dr. Coe testified that the center of the bone may not be filled in yet, but the callus would have connected the bones. (*Id.* at p. 63). Based on his clinical judgment, Dr. Coe determined Hernandez did not need another x-ray. (*Id.* at p. 61). Also at that visit, Hernandez requested a trapeze, but Dr. Coe noted that Hernandez had no grip to use a trapeze. (Doc. 158-8 at p. 52).

On October 7, 2015, Hernandez complained to Dr. Coe about his mattress deflating from a large hole. (*Id.* at p. 55). The request for a replacement alternating air mattress was

approved during Wexford's collegial review process on October 20, 2015. (*Id.* at p. 56).

Hernandez again complained about his mattress leaking air, this time to a nurse, on February 17, 2016. (*Id.* at p. 60). His air mattress was replaced with a "regular foam mattress." (*Id.*). On March 4, 2016, Dr. Coe noted that Hernandez had no particular complaints and "feels OK." (*Id.* at p. 61).

On May 19, 2016, Hernandez was seen by Physician's Assistant James for a follow-up examination. PA James wrote that Hernandez complained of arm pain from over one year ago.[2] (Doc. 148-16). Hernandez next saw Dr. Coe on June 6, 2016, and complained about his air mattress leaking air.[3] (Doc. 158-8 at p. 62). Dr. Coe noted that he would have "Nancy" look into the mattress. (*Id.*). A week and a half later, the mattress was still leaking air. (*Id.* at p. 63). Hernandez reported to another PA that the mattress did not provide adequate support, it was causing him significant discomfort, and he felt like he was in a hole when lying on his side. (*Id.*). The PA noted that he or she discussed Hernandez's concerns about the mattress with Jon-Michael Allender, the Director of Nursing.

Allender, a Wexford employee, planned to check the mattress adjustments to ensure it was properly functioning and inflated. (*Id.*). Even though Allender believed the mattress was functioning, he got a different air mattress out of storage and provided it to Hernandez. (Doc. 158-4 at p. 21). Allender believed this mattress functioned properly

---

[2] At this point, Hernandez's injury had occurred over 11 months prior, but not more than one year.
[3] It is unclear when the regular foam mattress was switched to another air mattress.

because he plugged it in and aired it up. (*Id.*). When Allender checked in with Hernandez the following day or within a few days, Hernandez said things were going fine. (*Id.*).

On June 27, 2016, Hernandez again complained to Dr. Coe about the mattress. (*Id.* at p. 64). Dr. Coe noted that the mattress "has a temporary fix to it." (*Id.*). That same day, Hernandez filed a grievance stating that his air mattress was not working, leaving his body sunk in the center and causing him extreme pain in his neck and left shoulder and arm. (Doc. 167-14). Hernandez further stated in his grievance that he told Defendants Dr. Coe, Lorie Cunningham, Allender, and Dee Brookhart about the mattress not working, that an open wound on his right buttock was getting bigger, and that he had a burning discomfort in his left buttock. (*Id.*). The grievance stated that Dr. Coe told Hernandez he would not replace the air mattress since he was so close to his release date of July 25, 2016. (*Id.*).

Defendant Anne Tredway was the Assistant Warden of Programs at Lawrence from August 2012 through September 2015. (Doc. 153-3). As the Assistant Warden of Programs, Tredway's duties included overseeing the programming for inmates at Lawrence as well as overseeing multiple departments, including the Health Care Unit. (*Id.*). Defendant Brookhart was the Assistant Warden of Programs at Lawrence from February 2016 through January 1, 2019. (Doc. 153-2). Brookhart also served as the Americans with Disabilities Act (ADA) Coordinator. (*Id.*). Defendant Cunningham, a registered nurse currently employed by the IDOC, has been the Health Care Unit Administrator ("HCUA") at Lawrence since December 22, 2015. Prior to that, she was the Director of Nursing and an employee of Wexford. (*Id.*). As the HCUA, Cunningham's job

responsibilities were to direct, coordinate, and review activities of healthcare operations in conjunction with the Medical Director and the Nursing Director. (*Id.*). Tredway, Brookhart, and Cunningham could not make decisions regarding the medical care of individual inmates, nor could they order any outside medical consultations or prescribe any type of medical device. (*Id.*). While Cunningham was the Director of Nursing, however, she ensured an alternating air mattress was ordered for Hernandez, after a doctor prescribed it. (*Id.*; Doc. 153-6).

Although they did not provide medical care, Defendants Tredway, Brookhart, and Cunningham were required to conduct rounds in the infirmary, listen to patients' complaints, investigate those complaints, and ensure that Wexford and its staff were addressing patients' medical needs and complying with IDOC policy. (Doc. 167-6 at pp. 26-27; Doc. 167-7 at pp. 55-60; Doc. 167-2 at pp. 173-74).

According to Brookhart, there were periods of time when the call button system in the infirmary did not work reliably. (*Id.* at p. 69). Cunningham testified that the batteries in the call buttons would sometimes run out and need to be replaced. (Doc. 167-2 at p. 145). Additionally, Cunningham explained, the call button alert could be silenced by the correctional officers, although it was never permissible for staff to ignore a call button request. (*Id.* at pp. 145-47).

According to Tredway, once a call button was pressed, it should be responded to within a few minutes. (Doc. 167-6 at p. 56). She admitted, however, that offenders sometimes complained that the call button was being ignored. (*Id.* at pp. 56-57). When an inmate complained, Tredway would talk to the nurses to make sure they realized they

needed to respond to call buttons promptly. (*Id.* at p. 59). Tredway recalled Hernandez specifically complaining to her about the nurses not responding to the call button in a timely manner. (*Id.* at pp. 70-72). When Hernandez complained to her, Tredway would talk to the nurses about their responsibilities and take the complaint to the HCUA and the Director of Nursing. (*Id.* at p. 73). Hernandez testified, however, that the problem with the call button continued even after he talked to Tredway. (Doc. 167-1 at p. 57).

Hernandez was released from Lawrence on July 25, 2016. He attested that he had open wounds on his left and right buttocks at that time.[4] (Doc. 171-1). Hernandez also was experiencing pain in his left arm after his release, so he saw a doctor who performed an x-ray. (Doc. 148-4 at pp. 22, 26). The x-ray performed on December 2, 2016, showed that Hernandez's arm was still broken. (*Id.* at p. 22; Doc. 148-11 at p. 5). Hernandez had surgery to repair the fracture on February 2, 2017, which required the use of a bone graft, as well as a metal plate and screws. (Doc. 148-17). Hernandez still experiences pain in his left arm. (Doc. 148-4 at p. 21).

Hernandez filed his Complaint in this matter on December 12, 2017 (Doc. 1), and a First Amended Complaint on April 25, 2018 (Doc. 49). Hernandez also filed a complaint in a separate case, which ultimately was consolidated with this matter. (*See* Doc. 68; Case No. 18-cv-1442, Doc. 1). After several court orders dismissing Hernandez's *respondeat superior* claims, the following counts remain in this case:

---

[4] The Wexford Defendants have moved to strike the affidavits of Hernandez and his mother, Dora Hernandez, because they allegedly contain medical opinions that neither affiant is qualified to provide. The Court disagrees; their statements that Hernandez had "open wounds" are not medical opinions. Rather, the affidavits are based on Hernandez's and his mother's personal knowledge and observations of his wounds and disabilities. Accordingly, the Motion to Strike (Doc. 172) will be denied.

Count 1:    Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, against the IDOC;

Count 2:    Violation of the Rehabilitation Act ("RA"), 29 U.S.C. § 794 *et seq.*, against the IDOC;

Count 3:    Eighth Amendment deliberate indifference claims against Treadway, Coe, Cunningham, Allender, and Brookhart; and

Count 4:    Eighth Amendment deliberate indifference claims against Wexford based on its policies or customs.

Hernandez has moved for partial summary judgment as to Count 3 as it relates to Dr. Coe. (Doc. 148). Defendants have moved for summary judgment on all claims. (Docs. 152, 154).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." *Id.* (citation omitted).

**DISCUSSION**

## I.   Deliberate Indifference to a Serious Medical Need

The Eighth Amendment prohibits cruel and unusual punishments and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm" — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)).

To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately, that is subjectively, indifferent to that condition. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir.), *cert. denied,* 140 S. Ct. 50, 205 L. Ed. 2d 38 (2019). A medical condition is objectively serious if " 'a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson.'" *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014)).

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Gayton v. McCoy*, 593 F.3d 610, 653 (7th Cir. 2010). The plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

### A.      The Wexford Defendants

#### 1.      Fractured Forearm

Hernandez and Dr. Coe have both moved for summary judgment on Count 3 as it relates to Dr. Coe's alleged deliberate indifference to Hernandez's fractured forearm. (Docs. 148, 154). There is no dispute that Hernandez suffered from an objectively serious medical condition or that Dr. Coe knew of that condition. Thus, the only question is whether Dr. Coe was deliberately indifferent to Hernandez's condition—*i.e.*, whether he knowingly or recklessly disregarded it.

Based on the summary judgment record, a reasonable jury could conclude Dr. Coe was deliberately indifferent to Hernandez's broken arm. Dr. Coe discontinued the use of a splint for Hernandez's fractured ulna on July 15, 2015, just nine days after an x-ray showed the bone was still broken. While Dr. Coe prescribed pain relievers to Hernandez, no further treatment for the broken arm was provided after Dr. Coe physically manipulated the arm and found that a callus had formed.

Dr. Paul Lamberti, Hernandez's retained expert witness, is a licensed orthopedic surgeon. (Doc. 158-5). Dr. Lamberti opined that "Dr. Coe's refusal to provide Mr. Hernandez with any treatment for his fractured arm after removing the splint at six weeks, despite the fact that (1) the July 6 x-ray showed incomplete healing, suggesting a risk of non-union, and (2) Mr. Hernandez complained for a year following the date of his injury, constitutes a gross deviation from acceptable healthcare." (Doc. 148-11).

Indeed, Dr. Coe admitted that he brought up Hernandez's fracture during collegial review, but that, "for one thing, sending him out is going to be a real problem"

due to his partial quadriplegia. (Doc. 168-4 at p. 175). Additionally, he testified, "the fracture itself was kind of like, well, you know, he's not exactly somebody that's going to be out digging ditches in the future." (*Id.*). When asked what he meant by that, Dr. Coe explained: "It's not going to be like he's a laborer and has to have a great outcome with his fracture. His arms are weak and he doesn't use them that much. You know, basically he stays in bed, gets carried around, put in wheelchairs, pushed around, you know. If he goes out to the gym where basically it's just kind of a socializing experience, he doesn't really do anything but sit in a wheelchair and talk with other wheelchair patients . . . ." (*Id.* at p. 176). Accordingly, the decision was made to "try to take care of it there at the prison and not send him to Champaign-Urbana." (*Id.*).

According to Dr. Lamberti, however, numerous medical studies confirm that arms are the most important limbs for patients with quadriplegia and that Dr. Coe's explanation of his refusal to refer Hernandez to an orthopedic specialist to have his broken arm evaluated "is not based on any medical judgment." (Doc. 148-11 at p. 5).

Furthermore, there is evidence that Hernandez continued to complain about pain in his arm. Hernandez complained that his forearm still hurt when Dr. Coe physically manipulated it on August 4, 2015, during a visit with a PA eight days later, and during a May 19, 2016 visit with a PA (Doc. 148-3 at pp. 58, 65, 69-70; Docs. 148-15, 148-15, 148-16). Hernandez also testified that he had "massive pain" in his arm when using his wheelchair and that he asked Dr. Coe to check his arm again. (Doc. 148-4 at p. 7; Doc. 148-2 at p. 16). When Hernandez told Dr. Coe he was having a lot of pain, Dr. Coe would say "well, you broke it," and he would laugh and walk away. (*Id.* at p. 21).

At the same time, however, a jury could find that Dr. Coe exercised his professional judgment in deciding to discontinue treatment, and a disagreement with a physician's professional judgment is insufficient to make a *prima facie* case of deliberate indifference. Dr. Lamberti testified that the fracture of Hernandez's forearm was reduced, meaning the bones were lined up with one another such that a callus could form and the fracture could heal without surgical intervention. (Doc. 158-5 at p. 9). Dr. Coe also testified that, in his clinical judgment, another x-ray was not required after he physically manipulated Hernandez's forearm in August 2015 and felt that a callus had formed. (Doc. 158-3 at p. 200). Finally, Dr. Coe submits there is a question of fact as to whether Hernandez continued to experience ongoing pain in his left forearm in the years following the fracture. Dr. Coe testified that the medical record prepared by a PA on May 19, 2016, does not indicate the amount of pain or where the arm hurt, and that Hernandez had Tylenol 3, Motrin, gabapentin, and baclofen for pain. (Doc. 148-3 at pp. 70-71).

Based on this evidence, the Court finds there are outstanding questions of fact and thus neither party is entitled to summary judgment on Hernandez's claim of deliberate indifference to his fractured forearm. Both motions are denied on those grounds.[5]

### 2.   Alternating Air Mattress

Dr. Coe and Allender next argue they are entitled to summary judgment on Hernandez's claim of deliberate indifference regarding his need for a functioning air

---

[5] Hernandez also moved for summary judgment on the Wexford Defendants' affirmative defenses of Eleventh Amendment sovereign immunity and the Prison Litigation Reform Act's requirement that a prisoner must disclose his litigation history. The Wexford Defendants have withdrawn these defenses (Doc. 166); thus, Hernandez's motion as it applies to Wexford's affirmative defenses is moot.

mattress in order to avoid pressure ulcers. Specifically, Dr. Coe argues that (1) he immediately ordered an alternating air mattress when Hernandez arrived at Lawrence; (2) he ordered that Hernandez be turned regularly pending receipt of that mattress; and (3) when the air mattress needed to be replaced, he did so immediately. Allender asserts he is entitled to summary judgment because there is no evidence that he denied Hernandez access to a working alternating air mattress. Both Defendants argue that even Hernandez's expert admitted the pressure ulcer on his right buttock healed because of the medical care he received at Lawrence. (Doc. 158-6 at p. 14).

In response, Hernandez argues it is undisputed that he complained in-person to both Coe and Allender about his mattress deflating, and both defendants had the ability to obtain a new mattress for him. Moreover, whether Hernandez's pressure ulcers became worse in 2016 because of the malfunctioning air mattress must be resolved by a jury.

The Court agrees with Hernandez. The evidence in the record, construed in the light most favorable to Hernandez, indicates that he complained to Dr. Coe about his mattress leaking air on June 6, 2016. Hernandez also filed a grievance stating that he told Allender about the leak and that his pressure wounds were getting worse. Yet, Allender never ordered a new mattress. Instead, he retrieved one from storage that also malfunctioned. Hernandez then complained to Dr. Coe again in late June 2016 about the deflating mattress, but Dr. Coe told Hernandez he would not get a new mattress so close to his release date. There is also evidence that Hernandez's right buttock wound worsened and he developed a left buttock wound while at Lawrence. On this record, a

jury could find Dr. Coe and Allender were deliberately indifferent to a serious risk of harm to Hernandez by failing to provide him with a functioning air mattress in 2016.

        3.    <u>Trapeze</u>

The Wexford Defendants next argue they are entitled to summary judgment as to any claim regarding the failure to provide Hernandez with a trapeze. Hernandez does not dispute this point; therefore, Defendants are entitled to summary judgment on this ground.

        3.    <u>*Monell* Claim Against Wexford</u>

In Count 4, Hernandez asserts Wexford had a practice of failing to enforce its policy requiring infirmary staff to respond to inmates' calls for help and it knew that doing so posed a substantial risk that patients would be deprived of their constitutional rights.

While Wexford is a private corporation, under Seventh Circuit law, a private company that has contracted to provide essential government services, such as health care for prisoners, can be held liable if the constitutional violation was caused by an unconstitutional policy, practice, or custom of the corporation itself. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527, 209 L. Ed. 2d 260 (2021); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). To support a claim under 42 U.S.C. § 1983 on this theory, Hernandez must show: (1) Wexford's practice violated his constitutional rights; and (2) the practice was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* "This requires more than a showing of one or two missteps." *Id.* (quotation omitted). There must be

"systemic and gross deficiencies," of which policymakers were aware and failed to correct them, thereby "manifesting deliberate indifference." *Id.*

Here, Dr. Roderick Matticks, Wexford's lead regional medical director and corporate representative, testified that Wexford requires its employees to respond to a call button system and, furthermore, expects its staff to respond to patient needs, however they are made aware of the need for assistance. (Doc. 168-8 at pp. 30, 33-34, 44). Dr. Matticks also stated that it is the Director of Nursing's responsibility to ensure staff are hearing the calls for help from inmates in the infirmary. (*Id.* at p. 35). Dr. Matticks testified that Wexford relies on its Medical Director and Director of Nursing to ensure its policies are being followed, as well as reports from IDOC staff. (*Id.* at pp. 51-52). According to Dr. Matticks, prior to this lawsuit, Wexford was unaware that nurses at Lawrence were not responding to calls for help from infirmary patients. (*Id.* at p. 50). Dr. Matticks also indicated that the IDOC would contact Wexford if there were an urgent need or problem with a particular patient. (*Id.* at p. 52). In this case, Wexford was unaware of any issue with Hernandez, including his grievance that staff were turning off the call button system. (*Id.*).

Defendant Allender, the Director of Nursing, testified that he would ensure the nurses were complying with Wexford policies by doing spot checks, reviewing the nurses' notes in the medical records, and checking in with patients. (Doc. 168-21 at p. 19). With regard to patient calls for help, Allender stated he never had any complaints that nurses were not responding to calls. (*Id.* at pp. 20, 68). Allender testified that he would ask patients how things were going, and if a complaint was brought to his attention, he

would address it at that point in time. (*Id.* at pp. 20-21). With regard to Hernandez specifically, Allender did not recall him ever complaining about nurses failing to respond to the call button. (*Id.* at p. 107).

Hernandez disputes these facts, pointing to evidence that it was "common knowledge" among inmates in the infirmary and among IDOC staff that Wexford staff often failed to respond to call button requests. For example, in November 2014, Tredway reported in her IDOC Monthly Inspection Form that inmates in the infirmary complained that nurses were not responding to the call button promptly. (Doc. 168-9 at p. 2). Hernandez testified that the inmates knew when Wexford staff turned the call button off because they would not hear any beeping sound upon pressing the button. (Doc. 148-4 at p. 16). The nurses would also tell the inmates in the infirmary that the call button system was off. (*Id.*). Hernandez further produced an affidavit from a fellow inmate who also resided in the infirmary and who witnessed the medical staff failing to respond to the call button, especially at night. (Doc. 148-6).

Hernandez also points to Wexford's interrogatory responses, in which it admits it did not "investigate, analyze, uncover, prevent, or determine the prevalence of any misconduct, deficiency, shortcoming, or other problem related to Wexford policies and procedures" regarding medical and nursing care for inmates in the Lawrence infirmary at any point between July 1, 2014, and July 31, 2016. (Doc. 168-24). Hernandez argues Wexford cannot avoid its constitutional obligations by simply failing to investigate conduct or facts that it suspected to be true.

From this evidence, the Court concludes there is a triable issue of fact as to whether

Wexford had an unwritten practice of failing to enforce its policies with regard to the call button system in the infirmary. IDOC staff were aware that the call button was not being responded to in a timely manner, and Wexford relied on IDOC staff reports—like Tredway's—to ensure its policies were being followed. A reasonable jury could therefore find that while Wexford had a written policy requiring medical staff to timely respond to the call button, the staff failed to do so, Wexford knew it, Wexford did nothing about it, and Hernandez's constitutional rights were violated as a result. Thus, Wexford's motion for summary judgment on Count 4 is denied.

### B.   IDOC Defendants

#### 1.   Personal Involvement of IDOC Defendants

The IDOC Defendants—Tredway, Brookhart, and Cunningham—argue they cannot be held liable for deliberate indifference to Hernandez's medical needs because they had insufficient personal involvement in his medical care. In fact, Defendants aver, Hernandez admitted none of these Defendants had involvement in his actual medical care. Therefore, they did not have the requisite personal involvement to be found liable under Section 1983.

Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's." *Burns v. Fenoglio*, 525 F. App'x 512, 515 (7th Cir. 2013) (quoting *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009)). "[T]op-level administrators are entitled to delegate to others the responsibility for specific prison functions, including providing medical care." *Id.* "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable

hands." *Giles*, 914 F.3d at 1049 (quoting *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)). Non-medical prison officials can be held liable for deliberate indifference, however, where they have actual knowledge or a reason to believe that prison medical staff are mistreating or failing to treat a prisoner. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (citing *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) "Non-medical defendants cannot simply ignore an inmate's plight." *Id.*

Here, there is evidence that the IDOC Defendants—while not personally involved in providing Hernandez's medical care—had actual knowledge of the medical staff's failure to treat him. All three IDOC Defendants testified that they were required to conduct rounds in the infirmary, listen to patients' complaints, investigate complaints, and ensure that medical staff were addressing patients' needs and complying with IDOC policy. (Doc. 167-6 at pp. 26-27; Doc. 167-7 at pp. 55-60; Doc. 167-2 at pp. 173-74). On June 27, 2016, Hernandez stated in a grievance that he told Cunningham and Brookhart, the HCUA and an Assistant Warden, respectively, that his alternating air mattress was not working, that an open wound on his right buttock was getting bigger, and that he had a burning discomfort in his left buttock. (Doc. 167-14). And Tredway specifically recalled Hernandez complaining to her about the nurses not responding to the call button in a timely manner. (Doc. 167-6 at pp. 70-72). Based on this evidence, the Court finds that the personal involvement requirement is satisfied.

### 2.   Evidence of Deliberate Indifference

The IDOC Defendants next argue that even if they were personally involved, there is no evidence that they were deliberately indifferent to Hernandez's medical needs. On

this point, the Court agrees.

Defendant Tredway testified that when Hernandez told her about the nurses not responding to the call button, she would ensure the issue was addressed by informing the HCUA and the Director of Nursing and by making sure the nurses were present during her rounds in the infirmary. (Doc. 167-6 at p. 73). She also would talk to the nurses about their responsibilities. (*Id.*). Tredway also attested that because Hernandez only brought up the issue of the call button to her once, and she made almost daily rounds in the infirmary, she believed that his issue was adequately addressed. (Doc. 153-3). She further noted that the call button was functioning properly when she inspected the infirmary on her rounds, and that the nurses were present and attending to the individuals in the infirmary during one of her monthly surprise inspections. (*Id.*). Tredway recalled one other occasion when Hernandez complained about his mattress and, while she did not remember the specifics, she attested that she would have followed up with the HCUA and the Director of Nursing to ensure his complaints were addressed. (*Id.*). Tredway attested she did not ignore Hernandez's complaints. (*Id.*). And Hernandez admitted it was possible that Tredway could have talked to the nurses about responding to the call button, but that the nurses did not follow her direction. (Doc. 167-1 at p. 58).

Brookhart attested that she does not recall Hernandez complaining directly to her or writing any grievances about issues he had with his alternating air mattress, but that if he had, she would have referred the complaint to the HCUA or the Director of Nursing. (Doc. 153-2). She further attested that she did not and does not ignore inmate complaints. (*Id.*). According to Hernandez, he told Brookhart about his mattress during a face-to-face

conversation on a walk to the ADA gym. (Doc. 153-1 at p. 72). He could not, however, recall when the conversation took place or what he told her, and he admitted he does not know if Brookhart assisted with him getting a new mattress. (*Id.* at p. 73).

Cunningham testified that she does not recall any complaints or grievances from Hernandez about his alternating air mattress, but as the HCUA, she would have referred the issue to the Director of Nursing to address. (Doc. 161 at p. 2). She attested that she would not have ignored an inmate's complaints. (*Id.*). Hernandez testified that he got Cunningham's attention one time and told her about the mattress, though he was not sure when the conversation occurred. (Doc. 153-1 at p. 75). He also was not sure whether Cunningham helped to get him a new mattress. (*Id.*).

Hernandez argues that Defendants' testimony about what they "would have done" when presented with complaints is not reliable evidence. The Court is not convinced. Tredway gave competent testimony as to how she handled Hernandez's complaints. Brookhart and Cunningham could not recall any specific complaints from Hernandez, and Hernandez also did not know the specifics of any conversations he had with these Defendants or if they took any action. Furthermore, Brookhart and Cunningham were not medical practitioners, were unable to order medical devices, and were entitled to rely on the judgment of medical professionals. *See Giles*, 914 F.3d at 1050 (non-medical officials who referred complaints to medical staff had no duty to do any more than they did, in light of their knowledge of the situation).

Based on this evidence, no reasonable jury would find that Defendants Tredway, Brookhart, or Cunningham deliberately disregarded a known risk of harm to Hernandez

or turned a blind eye to his plight. Accordingly, the IDOC Defendants are granted summary judgment on the deliberate indifference claim in Count 3.

## II.     ADA and Rehabilitation Act

The IDOC asserts it is entitled to judgment as a matter of law on Hernandez's claims that it violated the ADA and the Rehabilitation Act by failing to provide a reasonably comfortable and safe place to sleep and by failing to accommodate his request to ensure infirmary staff did not ignore his calls for help turning over in bed.

Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act prohibits any agency that receives federal funds from excluding, subjecting to discrimination, or denying the benefits of any of their programs to otherwise qualified individuals with disabilities. 29 U.S.C. § 794(a). Failure to make reasonable accommodations to ensure participation in the public entity's programs or services by a person with a disability qualifies as "discrimination." 42 U.S.C. § 12112(b)(5)(A).

"In the prison context, a plaintiff can make out a *prima facie* case of discrimination under both the ADA and the Rehabilitation Act by showing: (1) he is a qualified person; (2) with a disability; (3) the Department of Corrections denied him access to a program or activity because of his disability or otherwise subjected him to discrimination; and (4) the denial or discrimination was by reason of his disability." *Farris v. Kurr*, No. 16-CV-272-SMY-RJD, 2018 WL 3036130, at *3 (S.D. Ill. June 19, 2018) (citing *Jaros v. Illinois Dep't*

*of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)).

Evaluating the reasonableness of a particular accommodation in the prison context is particularly fact-intensive and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff. *Golden v. Illinois Dep't of Corr.*, No. 12-CV-7743, 2016 WL 5373056, at *4 (N.D. Ill. Sept. 26, 2016) (citing *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001); *Holmes v. Godinez*, 311 F.R.D. 177, 226 (N.D. Ill. 2015)). "Security concerns, safety concerns, and administrative exigencies [are] important considerations to take into account." *Id.* (citing *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996)). The key question is whether the inmate was able to participate in the activities in question, given his disability, with or without reasonable accommodations from the prison. *Love*, 103 F.3d at 560.

Here, it is undisputed that Hernandez is a qualified individual with a disability and that IDOC is a public entity. Thus, the only question is whether the IDOC denied him access to a program or activity because of his disability.

The IDOC argues Hernandez was provided with appropriate accommodations, including a bed assignment in the infirmary where he was provided with an alternating air mattress to accommodate his medical needs. Defendant contends Hernandez is merely complaining that he received incompetent treatment for his disability, which does not constitute a violation of the ADA.

Hernandez, on the other hand, asserts that case law establishes sleeping is an activity or program under the ADA, and prisons are required to provide inmates with sleeping accommodations that accommodate their disability-related needs. Each case

cited by Hernandez, however, was the district court's preliminary review of a Section 1983 complaint under 28 U.S.C. § 1915A, where the court determines whether a claim has any arguable basis in either law or fact. These cases were in a very different procedural posture and hardly establish that sleeping is an activity or program under the ADA. *See Rosario v. Wexford Health Care*, No. 15-CV-1008-MJR, 2015 WL 5935244 (S.D. Ill. Oct. 13, 2015); *Simmons v. Ill. Dep't of Corr.*, No. 14-cv-479-JPG, 2014 WL 2159000 (S.D. Ill. May 23, 2014); *Legore v. Allsup*, No. 16-CV-01137-MJR, 2017 WL 131578 (S.D. Ill. Jan. 13, 2017).

Even if sleeping qualified as a program or activity under the ADA, the IDOC did not deny Hernandez access to a bed that accommodated his disability-related needs. The IDOC provided Hernandez with permanent quarters in the infirmary with alternating air mattresses to help avoid new or worsening pressure ulcers. Hernandez complains that the air mattresses malfunctioned and that the nurses did not turn him often enough, but the ADA is not violated "by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *see also Johnson v. Redmond*, No. 17 C 50210, 2017 WL 6813706, at *2 (N.D. Ill. Oct. 30, 2017); *Wilson v. Murphy*, No. 14-CV-222-BBC, 2016 WL 1248993, at *6 (W.D. Wis. Mar. 29, 2016) (medical treatment decisions are outside the scope of the ADA and RA). While the Court is sympathetic to Hernandez's needs, the record here does not establish a violation of the ADA or Rehabilitation Act. *See Nesbitt v. Williams*, No. 13 C 9241, 2017 WL 1079240, at *3 (N.D. Ill. Mar. 21, 2017) ("As Nesbitt's desire for a softer mattress is a means to treat his medical condition, the Court also holds that the alleged failure to provide him with a softer mattress does not state a claim under the ADA."); *Boston v. Dart*, No. 14 CV 8680, 2016

WL 5373083, at *7 (N.D. Ill. Sept. 26, 2016) ("The ADA does not require [Defendant] to ensure that [Plaintiff] is free from any and all effects of his paraplegia.").

For these reasons, the IDOC is entitled to summary judgment on Hernandez's claims in Counts 1 and 2 under the ADA and the Rehabilitation Act.[6]

CONCLUSION

For these reasons, the Motion for Partial Summary Judgment filed by Plaintiff José Hernandez (Doc. 148) is **DENIED in part and deemed MOOT in part.** The motion for summary judgment filed by Defendants Illinois Department of Corrections, Dee Brookhart, Lorie Cunningham, and Anne Elizabeth Tredway (Doc. 152) is **GRANTED**. The motion for summary judgment filed by Defendants Wexford Health Sources, Inc., John Coe, M.D., and Jon-Michael Allender (Doc. 158) is **GRANTED in part and DENIED in part**. The Wexford Defendants are entitled summary judgment on Hernandez's claim of deliberate indifference as to his request for a trapeze. And, as set forth in footnote 4, the Motion to Strike (Doc. 172) is **DENIED**.

---

[6] Hernandez moved for summary judgment on the IDOC Defendants' affirmative defense that injunctive relief is barred as a matter of law, noting that he does not seek injunctive relief in this case. (Doc. 148). As noted by Defendants, however, Hernandez also would not be entitled to compensatory damages on his ADA or Rehabilitation Act claims, as compensatory damages are only available for those claims when a plaintiff shows deliberate indifference on behalf of a state actor. *Hildreth v. Butler*, 960 F. 3d 420 (7th Circ. 2020). That is, the plaintiff must show the defendants "knew that harm to a federally protected right was substantially likely and ... failed to act on that likelihood." *Id.* at 431. Because Hernandez has not demonstrated any deliberate indifference on behalf of the IDOC Defendants, he also would not be entitled to compensatory damages under the ADA or Rehabilitation Act.

Hernandez shall now proceed to trial on his remaining claims in Counts 3 and 4 against the Wexford Defendants. A status conference will be set by separate order to select a firm trial date.

**IT IS SO ORDERED.**

**DATED:   August 2, 2021**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**